# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LARRY DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No: 09 C 2883 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Larry Davis, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Davis asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Davis applied for DIB and SSI on March 19, 2007, alleging that he had been disabled since January 1, 2006, as a result of a car accident that left him with injuries to his cervical spine. (Administrative Record ("R.") 74, 133-137). His application was denied initially and upon reconsideration. (R. 78-82, 84-91). Mr. Davis continued pursuit of his claim by filing a timely request for hearing. An administrative law judge ("ALJ") convened a hearing, but at that time, Mr. Davis was unrepresented and claimed

to have some records of treatment he wanted to add to the evidence in his file. The ALJ explained the benefits of representation, and allowed Mr. Davis five months to look for an attorney and either gather the records or provide the ALJ's staff with the necessary information to gather them. (R. 25). When the ALJ reconvened the hearing on July 8, 2008, Mr. Davis had not retained an attorney and chose to proceed *pro se*. (R. 29). He had not come up with any of the additional evidence he claimed to have either, nor had he contacted the ALJ's staff. (R. 25-26). In addition to Mr. Davis appearing and testifying, Ms. Wyset testified as a vocational expert. (R. 23, 58-73). On October 27, 2008, the ALJ issued a decision finding Mr. Davis not disabled because he could perform light work, with a number of additional restrictions, and that such jobs exist in significant numbers in the local economy. (R. 13-21). This became the final decision of the Commissioner when the Appeals Council denied Mr. Davis's request for review of the decision on June 13, 2007. (R. 5-7). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Davis has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Mr. Davis, who is currently represented by counsel, does not argue that the ALJ failed to obtain a valid waiver of representation from him at his two hearings. *See, e.g., Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Mr. Davis explained that no attorneys were interested in taking his case because he had no medical evidence to support his claim for benefits. (R. 29).

# II.
# THE EVIDENCE OF RECORD
## A.
## Vocational Evidence

Mr. Davis was born on August 13, 1975, making him thirty-one years old at the time of the ALJ's decision. (R. 133). He made it through the twelfth-grade in high school, but lacked enough credits to graduate. (R. 36, 163). From 1994 to 2004 or 2005, Mr. Davis worked as a laborer out of a temp agency, doing various jobs ranging from driving to maintenance to repairing furniture. (R. 42, 160, 191). Mr. Davis explained that the job ended when he was "no longer needed . . . ." (R. 42). He also explained that he was let go because he was "too slow," but that was because he was working with all Spanish speaking workers and couldn't understand them. (R. 39). But he also said he was let go because he walked too slowly. (R. 41). At the time of his hearing, he had been watching his cousin's children for four days a week, for three months. (R. 37). He was paid $18 a day – $6 per child – by the Illinois Department of Human Services. (R. 37).

## B.

## Medical Evidence

Mr. Davis has had a few motor vehicle accidents. The medical record begins with Mr. Davis's treatment following an accident in early January 2003. X-rays of Mr. Davis's left hip revealed an old bone deformity of the left iliac bone with a small, benign, irregular bony defect. (R. 240). An x-ray of his cervical spine showed evidence of a previous surgery with a fusion at C3 to C5. (R. 240). A CT of his cervical spine revealed a previous surgical fusion from C3 to C5, and a "questionable fusion at the C6-

C7 level." (R. 239). There also appeared to be a mild bulging disc at C7-T1 and a small left cervical rib. (R. 239).

The disability agency arranged for Dr. Sandra Hare to perform a consultative examination on May 4, 2007. She noted that Mr. Davis complained that he had lost the power in his hands, claiming he was paralyzed. (R. 225). He said his balance was not good and he was not able to walk. (R. 225). Nevertheless, Mr. Davis had a normal range of motion in his lumbar spine. (R. 226). He exhibited a full range of motion in all his joints and normal strength in his upper extremities. (R. 227). Finger grasp and hand grasp were 5/5 bilaterally. (R. 227). His gait was normal and he could heel and toe walk. (R. 227). Reflexes and sensation were both normal. (R. 227).

On November 15, 2007, Mr. Davis sought treatment for complaints of left arm numbness. (R. 246). The notes are essentially illegible, but it appears that deep tendon reflexes were 2+, and strength in the left arm was 4/5, while the right arm was normal. (R. 246). Mr. Davis was referred for an EMG.

On July 10, 2008, Mr. Davis had an EMG, but then he was complaining of increasing tingling in his hands and *right* arm. (R. 249). The findings were consistent with "chronic (or prior) right cervical radiculopathy, primarily affecting the C6-C7 roots." (R. 249).

## C.
### Administrative Hearing Testimony

#### 1.
##### Plaintiff's Testimony

At the hearing, Mr. Davis testified that he can't work because his hands have lost power. (R. 49). He said he dropped things a lot, even light things. (R. 50). This had

been going on for two years, since 2006. (R. 50). Mr. Davis also said his hands "fold back on this [sic] arm." (R. 50). It was like a cramp; he had to wait for his hands to relax when it happened. (R. 51). He got pains in his neck every day. (R. 51). He relieved them by taking aspirin or Excedrin and lying down. (R. 52). His hands felt like they were burning; this had gone on since he was seventeen or eighteen years old, as the result of an accident. (R. 40). They felt that way continuously. (R. 40). He said he couldn't "really run at all;" his big toes were both numb. (R. 52). He had this numbness in his toes and fingers since 1993. (R. 53). That was when he had the cervical spinal fusion around the C6-C7 level following one of his accidents. (R. 48, 53). His toes cramped up, too, just like his hands. (R. 54).

Mr. Davis said he had no problems standing, and that he could probably walk about five blocks at a time. (R. 54). He could sit for ten to fifteen minutes before his neck hurt. (R. 55). To relieve it he might stretch or take aspirin. (R. 55). He didn't know how much weight he could lift. (R. 56). The strength in his arms was not a problem; the trouble was with his hands and dropping things. (R. 56-57).

Mr. Davis lived with his parents. (R. 44). He said he was able to drive a car, but his was broken down. (R. 44). He didn't help with the household chores. (R. 46). His mother did the cleaning, cooking, and shopping. (R. 45). He watched a lot of TV, and didn't have any friends. (R. 47).

### 2.
### The Vocational Expert's Testimony

Ms. Wyset then testified as a vocational expert. She said that Mr. Davis's past relevant work was unskilled labor, and ranged from medium to heavy in terms of exertional demands. (R. 65). The ALJ asked Ms. Wyset to consider a hypothetical

individual who could lift and carry up to ten pounds frequently, and twenty occasionally, sit up to six hours and stand or walk up to six hours in a work day, push and pull only occasionally, perform frequent but not constant manipulations, and avoid exposure to hazardous machinery, heights, and temperature extremes. (R. 66). Ms. Wyset said such a person couldn't perform any of Mr. Davis's past work, of course, but could perform other work in the regional economy. (R. 66). This included production assembly (12,000 jobs), and cleaner/housekeeper (10,800 jobs), and information clerk (10,000 jobs). (R. 66-67). If the same person could not perform under a production quota, they could still do the housekeeper work and information clerk work, but not the assembly work. (R. 67). If the person could handle a quota, but sit for just two hours a day, they could still perform all three jobs. (R. 67). The housekeeper and information clerk positions would tolerate a person being off task for 20 per cent of the time. (R. 68). If a person could sit just two hours and lift only ten pounds, all work was precluded. (R. 69).

## D.
## The ALJ's Decision

The ALJ found that Mr. Davis had a mild bulging disc at C7-T1, small irregular bony defect of the left iliac bone, spinal fusion at C3-C5, right cervical radiculopathy at C6-C7. (R. 15). These were severe impairments as defined by the regulations. (R. 15). The ALJ further found that Mr. Davis's impairments did not meet or equal one of the impairments in the Listing of Impairments, specifically § 1.02, covering major dysfunction of a joint, and § 1.04, covering spinal disorders. (R. 17). The ALJ felt that Mr. Davis exaggerated the extent and duration of his pain and numbness in his hands, arms, and neck. (R. 18). The medical evidence did not support his claims, nor did the record of treatment – or lack thereof. (R. 18). The ALJ also noted that Mr. Davis

continued working until late 2006, well after the accidents that caused his impairments. (R. 18). The ALJ then relied primarily on Dr. Hare's consultative examination to find that Mr. Davis retained the capacity to perform work that involved sitting for no more than two hours a day and only thirty minutes at a time, standing the remainder of the day, and lifting ten pounds frequently and twenty pounds occasionally, and that also allowed for being off task for 20% of the time. (R. 19). She then relied on the testimony of the VE to find that Mr. Davis could still perform work that existed in significant numbers in the local economy, including house cleaner and information clerk. (R. 20). Accordingly, she found Mr. Davis not disabled and not entitled to DIB or SSI. (R. 21).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must

reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544; *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008).

**B.**

**Five-Step Sequential Analysis**

Section 423(d)(1) defines "disability" as an: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467

U.S. 104, 107 n.1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and
>
> 5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Analysis

There is not a great deal of medical evidence in this case, and there is really nothing to indicate Mr. Davis is disabled. There are certainly diagnoses; objective, clinical studies that demonstrate that Mr. Davis has a number of defects in his cervical spine. But no doctor who examined of treated Mr. Davis has said that he is disabled to any degree. The only physician that commented on his capabilities to any extent was Dr.

Hare, and she found his range of motion in his back, strength in his arms, and manipulative ability in his hands to be normal or nearly so. There was nothing to indicate that Mr. Davis could not preform the restricted range of light work the ALJ found him capable of performing.

### 1.

Mr. Davis' first objection to the ALJ's decision is that the ALJ "played doctor." Of course, an ALJ may not substitute his own judgment for a physician's without relying on other medical evidence in the record. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). An ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record. *Young v. Barnhart,* 362 F.3d 995,1001 (7th Cir. 2004). Here, the ALJ did not dismiss the EMG, or interpret it on her own, she merely considered and weighed it along with the other medical evidence. She said as much in her decision: "I rely primarily on the May 2007 report of Dr. Hare in assessing the claimant's residual functional capacity, taken together with the EMG report of July 2008." (R. 19). She noted that the EMG finding of *right* side radiculopathy was inconsistent with the emergency room physician's finding of slight reduction in *left* side strength and *normal* right side strength in November 2007. (R. 19). Coupling that with Dr. Hare's finding of normal strength and manipulation bilaterally, the ALJ reasonably concluded that any effect the cervical impairment had on the upper extremities was slight. That's not playing doctor, that's weighing the evidence.

Mr. Davis relies on *Maxwell v. Sullivan*, 792 F.Supp. 582, 593 (N.D.Ill. 1992), where the court stated that the Appeals Council "played doctor" when it determined that

a CT scan was not new and material evidence that had a reasonable probability of changing the ALJ's decision that the claimant was not disabled. The ALJ had no opportunity to consider the CT scan, and in rendering his decision, he held that there was no objective evidence to establish that the claimant suffered from an impairment that could be expected to produce his alleged symptoms. *Id.* at 591. Because the CT scan demonstrated disc bulging at three levels, nerve impingement, and arthritic changes, *Id.* at 586 – objective findings all – of course there was a reasonable possibility that such evidence would change the ALJ's decision. The court determined that the Appeals Council erred, and the ALJ should have an opportunity on remand to consider the evidence. *Id.* at 593.

Here, conversely, the ALJ *did* consider the EMG, and weighed it along with the report of Dr. Hare and the comments of the emergency room physician. Moreover, it is not as though all the ALJ had was raw EMG findings; he had the interpretation of a physician, Dr. Richard Brannergan, that the findings were consistent with right-side, C6-C7 radiculopathy that was "chronic (or prior)." The medical record establishes this impairment at least as early as 2003, and Mr. Davis claims it stems back to an accident, and subsequent spinal fusion surgery, in 1993. So the EMG demonstrated an impairment – or rather, confirmed one that was already demonstrated. Moreover, it was an impairment that Mr. Davis had worked with for years. It is important to recall that Mr. Davis's employment did not end because of any disability but, according to him, because of a language barrier, the closing of the department, or his walking too slowly. Dr. Hare's musculoskeletal examination established the effects of the impairment, which were minimal at worst. Hence, the ALJ found a limitation to light work and a restriction

against constant manipulation. In other words, the EMG did not tell the ALJ anything new.

Mr. Davis seems to suggest that the ALJ was obligated to have a medical expert review the EMG, in addition to the doctor who interpreted the results. But an ALJ is not required to consult a medical expert where the record is adequate to render a decision. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); 20 C.F.R. § 404.1527(f)(2)(iii). Here, as already noted, the record was adequate. Then, in his reply brief, Mr. Davis argues that the ALJ had to call a medical expert to determine the onset of the radiculopathy. But the ALJ determined that Mr. Davis's radiculopathy was a severe impairment, so there is not a question of an onset date as there might be in a case where the relation back of medical evidence is an issue. *See Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004). Here, the impairment was severe, but not disabling. It impinged on Mr. Davis's ability to work, but only to the extent that he was limited to light work with some additional restrictions.

**2.**

Mr. Davis also argues that the ALJ failed to make a proper credibility finding. This argument, too, hinges on the ALJ's failure to have a medical expert interpret the EMG. Review in cases like this is highly deferential, *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000), and a reviewing court may reverse an ALJ's credibility determination only if it is so lacking in explanation or support that it is "patently wrong." *Jones v. Astrue,* __F.3d __, 2010 WL 4137570, *4 (7th Cir. 2010); *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009); *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008). Time and again, the Seventh Circuit has reminded the lower courts that they are not to substitute their

judgments for that of the ALJ on issues of credibility since the ALJ was in a far better position to make the credibility judgment. *Jones*, 2010 WL 4137570, *4 ("The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying."). *Compare Ashcraft v. Tennessee,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)("a few minutes observation of the parties in the courtroom is more informing than reams of cold record.").

The courts have also recognized that applicants for disability benefits have an incentive to exaggerate their symptoms, and an ALJ is free to discount the applicant's testimony on the basis of the other evidence in the case. *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir.2006); *Brown v. Chater,* 87 F.3d 963, 965-66 (8th Cir.1996). Thus, in determining whether the ALJ's conclusion is "patently wrong," we look to whether the ALJ's reasons for discrediting testimony are unreasonable or unsupported. *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir. 2006). What the court said in *Simila* bears repeating:

> We review the ALJ's decision directly, but we play an "extremely limited" role. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir.2008). We will not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Id.* Instead, we look to whether the ALJ built an "accurate and logical bridge" from the evidence to her conclusion that the claimant is not disabled. *Craft,* 539 F.3d at 673. We will affirm the ALJ's decision if it is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* ... Therefore, "even if 'reasonable minds could differ concerning whether [Simila] is disabled,' " we affirm if the ALJ's decision has adequate support.

573 F.3d at 513 - 514.

An ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the credibility

finding with specific reasons supported by the record. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). That is what the ALJ did here, providing reasons why she did not fully credit the extent of Mr. Davis's complaints. Her assessment of Mr. Davis's credibility was proper.

The main reason the ALJ thought Mr. Davis was exaggerating was the medical evidence. There simply was not any evidence to demonstrate that he was limited to the degree he claimed by his cervical spine problems. Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005); *Powers v. Apfel,* 207 F.3d 431, 435-36 (7th Cir. 2000). No doctor who examined Mr. Davis indicated he was limited any more than slightly due to his impairments. Dr. Hare found his arm and grip strength to be normal. The emergency room physician found his right arm strength to be normal and his left arm strength to be only mildly reduced. While the record established Mr. Davis had cervical spine problems, it simply did not depict an individual who was as severely limited as Mr. Davis claimed. *See*, *e.g., Simila*, 573 F.3d at 518-19 (normal or near normal musculoskeletal exam – strength, range of motion, etc.– undermined claimant's credibility); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 803-04 (7th Cir.2005)(complaints of extreme pain were inconsistent with the findings of all the doctors who examined claimant and opined that she had only minimal or moderate limitations).

The ALJ also noted that Mr. Davis really did not receive any treatment for what he described as nearly crippling symptoms. The regulations specifically instruct an ALJ to consider treatment history when assessing credibility. *Simila*, 573 F.3d at 519(citing 20 C.F.R. § 404.1529(c)(3)(v)). In Mr. Davis's case, as the ALJ noted, there isn't much.[1] He had spinal fusion surgery in 1993. Since then, he has barely visited a doctor, aside from a consultative exam arranged by the disability agency, the emergency room visit, and the EMG. He takes no prescription medications; only aspirin or Excedrin when he has pain. He claims to have undergone physical therapy at the county hospital, but the hospital had no record of it. (R. 26). The ALJ asked about the records, allowed Mr. Davis several months to either get them or provide the ALJ with the information to get them, but to no avail. (R. 25-26). Mr. Davis also explained that he didn't seek treatment for some of his ailments because he was "so used to it, that it didn't bother [him]." (R. 41). This is the type of record of infrequent treatment – or really, a lack of any treatment – that provides support for an adverse credibility finding, especially where the claimant does not provide any credible, consistent excuse for it. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir.2008); *Prochawska v.*

---

[1] Mr. Davis wisely does not argue that this dearth of medical evidence is the fault of the ALJ for failing to adequately develop the record or for not giving Mr. Davis adequate time to do so. An ALJ does have a heightened duty to do that when a claimant is unrepresented but, still, even a pro se claimant bears some responsibility for making a record. Johnson v. Barnhart, 449 F.3d 804, 808 (7th Cir. 2006); 20 C.F.R. §§ 404.1512(c); 416.912(c). After all, "who is in a better position to provide information about his own medical condition...." *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). *See also Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). And, even though Mr. Davis is now represented by counsel, neither he nor his attorney have presented these phantom treatment records. *Compare Nelms v. Astrue*, 553 F.3d 1093, 1098-99 (7th Cir. 2009)(once represented, claimant gathered additional supporting evidence).

*Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006); *Schmidt v. Barnhart,* 395 F.3d 737, 747 (7th Cir. 2005); *Sienkiewicz,* 409 F.3d at 804.[2]

The ALJ also reviewed Mr. Davis's activities, especially his work history. Mr. Davis worked as a cable wrapper and a machine operator despite his impairments, which he claimed adversely affected his hands since 1993. Although a claimant with a job may still be found disabled, *see Gentle v. Barnhart,* 430 F.3d 865, 867 (7th Cir.2005), an ALJ's assessment of residual functional capacity must be based on the relevant evidence in the record, which includes "reports of daily activities" and "evidence from attempts to work," SSR 96-8p. The ALJ's observation that Mr. Davis continued working until late 2006, well after the accidents that caused his impairments is significant, as the Seventh Circuit recently held in *Castile v. Astrue,* 617 F.3d 923, 927 (7th Cir. 2010).

Moreover, as the ALJ noted, Mr. Davis's testimony about why he left his last job further undermined his credibility. When he applied for benefits, he claimed his job ended when the department closed down due to "discrimination issues" – and added that he had back pain, not hand problems. (R. 159). At one point at his hearing, he said he was let go because he was too slow – not due to his hands, however, but due to the way he walked. (R. 41). Yet, Mr. Davis testified that he really didn't have any problems standing or walking. (R. 54). At another point in the hearing, Mr. Davis again changed the reason his last job ended: this time, it was because he was the only black employee among all Spanish speaking employees and he couldn't understand what was going on and *that's* what made him slow. (R. 39). So, not only did Mr. Davis change his story as

---

[2] The ALJ noted that Mr. Davis could receive medical treatment free of charge at the county hospital. Mr. Davis, residing with his parents at 3849 West Fillmore in Chicago, happens to live just over two miles from Stroger Hospital, the county hospital at 1901 West Harrison.

16

he went along, he didn't cite his manipulation problems as a reason for his stopping working.

**3.**

Finally, Mr. Davis briefly complains that the ALJ improperly disregarded the VE's testimony that, if all of Mr. Davis's allegations as to his limitations were accepted, there would be no work he could perform. But the ALJ was only required to rely on the VE's testimony that is based on those limitations the ALJ has found credible. *Simila*, 573 F.3d at 521; *Schmidt,* 496 F.3d at 846. As already discussed, the ALJ did not believe the extent of Mr. Davis's allegations as to his limitations – and properly so.

**CONCLUSION**

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE: November 23, 2010**